AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>A maroon 2001 Mitsubishi Montero SUV with VIN<br>JA4LS21H71P066281 with California License Plate<br>number 5WUC906 and is registered to Omar<br>Garcia, 434 Saturn Court, Nipomo, California<br>93444, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2:22-mj-01346-DUTY |

```
                                          FILED
                                CLERK, U.S. DISTRICT COURT

                                   04/01/2022

                                CENTRAL DISTRICT OF CALIFORNIA
                                BY: ____ dj ____ DEPUTY
```

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(b)(1) | Distribution of a controlled substance, |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*FBI SA Brian Sullivan*
_____
*Applicant's signature*

FBI SA Brian Sullivan
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: __April 1, 2022__

*Louise A. LaMothe*
_____
*Judge's signature*

City and state: __Santa Barbara, CA__

Hon. Louise A. LaMothe, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Samuel J. Diaz (213) 894-3045

## **ATTACHMENT A-2**

VEHICLES TO BE SEARCHED

The vehicle is described as a maroon 2001 Mitsubishi Montero SUV with VIN JA4LS21H71P066281, California license plate number 5WUC906 and is registered to Omar Garcia, 434 Saturn Court, Nipomo, California 93444.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining

to, obtaining, possessing, using, applications for, or
transferring money over $1,000, such as bank account records,
cryptocurrency records and accounts;

       f.   Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators, sources of supply of
controlled substances or firearms, or drug or firearms
customers, including calendars, address books, telephone or
other contact lists, pay/owe records, distribution or customer
lists, correspondence, receipts, records, and documents noting
price, quantities, and/or times when drugs, guns, or ammunition,
were bought, sold, or otherwise distributed, whether contained
in hard copy correspondence, notes, emails, text messages,
photographs, videos (including items stored on digital devices),
or otherwise;

       g.   Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

       h.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

j.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

k.   Contents of any calendar or date book;

l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

n.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device

pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

x

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. During the execution of this search warrant, law enforcement is permitted to: (1) depress Garret ORTALI's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Garret ORTALI's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Brian Sullivan, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant for GARRET ORTALI ("ORTALI") for violation of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

2.    This affidavit is also made in support of an application for a warrant to search the following residence, vehicle, and person:

   a.    The residence located at 2185 Beebee Street, San Luis Obispo, California, 93401 (the "SUBJECT PREMISES"), as described more fully described in Attachment A-1;

   b.    The vehicle operated by ORTALI, a maroon 2001 Mitsubishi Montero SUV with VIN JA4LS21H71P066281 with California License Plate number 5WUC906, registered to O.G., at an address on Saturn Court in Nipomo, California, as described more fully in Attachment A-2 (the "SUBJECT VEHICLE").

   c.    The person of ORTALI, as described more fully in Attachment A-3;

3.    The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(b)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute a Controlled Substance) (the "Subject Offenses"), as described more fully in Attachment

B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related only in substance and in part.

## II. <u>BACKGROUND OF AFFIANT</u>

5.   I am an investigative or law enforcement officer of the United States within the meaning 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of and to make arrests for offenses.

6.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 2003.  I am currently assigned as a member of the Central Coast Safe Streets Task Force ("CCSSTF") for the Los Angeles Division, Santa Maria Resident Agency ("RA").  The Santa Maria RA is responsible for investigating crimes committed by violent Drug Trafficking Organizations ("DTOs"), under Titles 18 and 21 of the United States Code.  In the course of my employment with the FBI, I have participated in the Santa Maria RA's current caseload of narcotics and criminal enterprise investigations.  In addition

to my current assignment and experience, I was previously assigned as a Supervisory Special Agent in the Organized Crime Drug Enforcement Task Force ("OCDETF") Fusion Center, FBI Headquarters.  I have also received specialized training in transnational organized crime techniques utilized by DTOs.

7.   Additionally, I have participated in multiple aspects of narcotics investigations including surveillance, the use of confidential human sources, electronic tracking of cellular telephones, and conducting court-authorized wiretaps.  I am familiar with narcotics traffickers' methods of operation including distribution, storage, and transportation of narcotics, as well as the collection and transportation of illegal drug proceeds and money laundering.

8.   I have been the affiant on several federal search warrants related to narcotics investigations.  During my tenure with the FBI, I have participated in several drug investigations, during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at suspected drug locations; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (e) conducted surveillance of individuals engaged in drug trafficking.  Through my training, education, and experience, I have become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the method of payment for such

drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

9.   The statements contained in this affidavit are based in part on information provided by confidential sources, information provided by other law enforcement officers, intercepted communications, and an analysis of telephone records.  I also relied on my experience and training as a law enforcement officer in evaluating this information.

10.   I am currently one of the agents assigned to an investigation of narcotics trafficking occurring in San Luis Obispo, California.  As shown and discussed in more detail below, the investigation has uncovered a large-scale narcotics trafficking ring being operated throughout San Luis Obispo and Santa Barbara Counties, California as enumerated in 21 U.S.C. §§ 841 and 846.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

11.   A Confidential Human Source ("CHS") working with the FBI purchased methamphetamine from ORTALI on March 21, 2022.[1] Specifically, on March 21, 2022, ORTALI sold the CHS approximately 142 grams of methamphetamine in Santa Maria, California.  The sale was conducted inside the SUBJECT VEHICLE, which ORTALI was driving.

---

[1] The CHS is being paid to work with law enforcement.  The CHS has prior misdemeanor convictions, including for fraud, possession of a controlled substance, burglary, petty theft, and possession of stolen property.  The CHS also has prior felony convictions for burglary, forgery, and possession of a firearm. On March 22, 2022, the CHS was arrested for vehicle theft and possession of stolen property and was discharged as a CHS. Charges are pending.

12.   I know from my conversations with other law enforcement officers that the SUBJECT PREMISES is ORTALI's residence.  Specifically, from numerous prior contacts with the San Luis Obispo Police Department; ORTALI listed this address in the San Luis Obispo Police Department records system; and ORTALI provided this address as his place of residence with the San Luis Obispo County Department of Probation.  I know from my observations during the March 21, 2022 controlled narcotics purchases with the CHS discussed below, that ORTALI was observed as the sole operator of the SUBJECT VEHICLE.  Furthermore, from surveillance conducted by TFO Justin Franics on March 28, 2022 at the SUBJECT PREMISES, TFO Francis observed ORTALI operate the SUBJECT VEHICLE to and from the SUBJECT PREMISES.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.   Based on my review of law enforcement reports, my own investigation in this case, my review of audio and video recordings, and my discussions with the CHS and other law enforcement agents, I know the following:

**A.   <u>June 17, 2021: ORTALI is contacted by the San Luis Obispo Police Department</u>**

14.   On July 15, 2021, I spoke with Detective Rouse from the San Luis Obispo Police Department and I learned the following:

15.   On June 17, 2021, San Luis Obispo Police Department Special Enforcement Team Detective Quenten Rouse and Detective Brent Inglehart observed ORTALI driving an SUV registered to him while not wearing a seatbelt.  Prior to the officers performing

a traffic stop, ORTALI pulled the SUV to the curb, exited the vehicle, and then began walking toward Detective's Rouse and Inglehart's marked police vehicle.  In a consensual roadside contact, and based upon Detective Rouse's extensive training and experience, Detective Rouse determined ORTALI was operating the SUV while under the influence of an unknown substance.  In addition to possessing narcotics on his person, ORTALI made voluntary statements indicating that he had last used narcotics 36 hours prior.

16.  Detective Inglehart observed, in plain view, a used methamphetamine pipe located inside the SUV on the center console of the front seat.  The detectives subsequently searched the SUV and found one pound of suspected heroin, two ounces of suspected fentanyl, 10 grams of suspected methamphetamine, and approximately 250 Xanax pills.  They then arrested ORTALI for possession of a narcotic controlled substance for the purpose of sales, and for committing a felony offense while out on bail. Most of the narcotics found inside of the SUV were located inside a shopping bag directly behind the driver's seat.

17.  In addition to the narcotics, the shopping bag also contained a Samsung Galaxy cellular phone (later determined to have a phone number ending in -5674) (the "ORTALI 5674 phone"), and a leather wallet containing ORTALI'S California driver's license, ORTALI's bank cards, and other miscellaneous cards with ORTALI's name on them.

18.  In a Mirandized interview, ORTALI told Detective Rouse that he had only been using the ORTALI 5674 phone for a short

period of time because he had just gotten the phone after he was recently robbed of another cell phone.  ORTALI said his cell phone number for his stolen phone ended in -9430 (the "ORTALI 9430 phone").  On June 18, 2021, Detective Rouse searched local law enforcement databases for the ORTALI 9430 phone.  During the search, databases listed ORTALI as subscriber for the ORTALI 9430 phone number.

19.  On June 24, 2021, the Honorable Michael L. Duffy, San Luis Obispo Superior Court, issued a search warrant (Search Warrant No. 14871) for the ORTALI 5674 phone.

20.  On June 29, 2021, pursuant to the state search warrant, Detective Rouse searched the ORTALI 5674 phone.  During this review, Detective Rouse saw text messages between ORTALI using the ORTALI 5674 phone and a contact named "John Bfc" with a phone number ending in -3312.  Detective Rouse searched a law enforcement database and identified "John Bfc" with the phone number ending in -3312 as J.C.  Based on Detective Rouse's review of the text messages between ORTALI and J.C., it appears that ORTALI and J.C. are involved in narcotics trafficking. Excerpts of the communications between ORTALI and J.C. are detailed below:

- **June 14, 2021:**

  - ORTALI: "What's the ticket on five??"

  - J.C.: "Hey my guy said he can't do it for any less than 700$ unless you buy 10[.]"

  - ORTALI: "Ok[.]"

  - J.C.: "So you want to get them for 700 or do you want

to get the pieces for 650 for 10??? Just let me
know[.]"

- o ORTALI: "U got white to[]?"
- o J.C.: "I can[.]" "How much[]"
- o ORTALI: "Not sure. Let me see how much I collect up
  here. And let. U know[]"

- **June 16, 2021**:

  - o J.C.: "Sorry that we got robbed. It really sucks.
    Ace said you wanted to meet at your pad, that's
    perfect. But one thing my guy is changing me 700$. I
    don't know what your selling them for but I need to
    get 800$ for each one, I remember you said you were
    selling them for more. I'd love to do more business
    with you good business. I got 5 for you right here.
    Let me know when you want to me to come up there. You
    have to give me 1 hour to get shit in order here. So
    I can be there in 3 hours or less. Let me know."

  - o ORTALI: "With all due respect and shit . . . I got
    took for 8640 and other than Ace & I I didn't speak on
    it . . . Still word got back about 2 people going
    hard. . . . Different 2people each story but . . . .
    Long story longer. . . . It[']d have to be on the
    front & I can pry to get um for u at 700[.]"

21. Based on my training, experience, the facts of the
investigation thus far, and other messages that appear to
concern drug trafficking found on the ORTALI 5674 phone, it
appears that in this conversation excerpted above, ORTALI is

attempting to purchase anywhere from five to ten ounces of
heroin from J.C.  J.C. states he can facilitate the purchase of
ten ounces of heroin for ORTALI at $650 an ounce if ORTALI can
buy ten ounces at a time.  This conversation shows ORTALI and
J.C. discussing a transaction for five ounces of heroin, ORTALI
getting robbed of $8,640 ("I got took for 8640") by two unknown
subjects, and ORTALI stating that he would need the heroin to be
"on the front" to him.

22.  Detective Rouse also saw text messages between the
ORTALI 5674 phone, and a contact named "Showtime81" (phone
number ending in -3600) from June 14, 2021.  Below are excerpts
from the text message conversation between ORTALI and
Showtime81:

- ORTALI: "So again total of with u need[?]"
- SHOWTIME81: "One zip and piece."  "Oh and bars[.]"
- ORTALI: "How many?"
- SHOWTIME81: "50[.]"

23.  Based on my training, experience, and the facts of the
investigation thus far, I know the term "zip" is slang for a
measurement of one ounce (often of methamphetamine), the term
"piece" is often associated with heroin, and the term "bars" is
often associated with pills such as "Xanax" in various milligram
doses.  It appears that in this text message conversation,
ORTALI is involved in at least one ounce quantity sales of both
methamphetamine and heroin as well as pills.

24.   During his search of the ORTALI 5674 phone, Detective
Rouse also saw a text message conversation in Spanish between
the ORTALI 5674 phone and a contact named "Fidel Amigo" (using a
phone number ending in -4753).  San Luis Obispo Sheriff's
Narcotics Unit Detective Noah Arnold, who speaks Spanish
fluently, translated the conversation from Spanish to English.

25.   Detective Arnold advised Detective Rouse that it
appeared "Fidel Amigo" arranged for ORTALI to purchase ten
pounds of methamphetamine, at a price of $1,650 per pound, from
the parking lot of a Home Depot in Santa Clarita, California.
Based on the text messages, it appears that the deal was set to
take place sometime between May 29, 2021 and June 2, 2021.

26.   On July 7, 2021, Detective Rouse reviewed T-Mobile
cellular phone tolls for the cellular telephone number ending in
-4753 pursuant to a subpoena served by Homeland Security
Investigations Special Agent Garret Fraser.  J.V. is listed as
the subscriber for the 4753 phone number (the "J.V. 4753
phone").  Based on Detective Rouse's review of the toll records,
the ORTALI 9430 phone and the J.V. 4753 phone number have
communicated approximately 147 times from June 9, 2021 to June
23, 2021.  The ORTALI 9430 phone and the J.V. 4753 phone have
also communicated approximately 14 times since ORTALI's release
from San Luis Obispo County Jail on June 18, 2021 and June 23,
2021.

27.   On December 20, 2021, FBI Task Force Officer ("TFO")
Justin Francis met with San Luis Obispo Sheriff's Deputy John

Jones to discuss ORTALI's drug trafficking activity.  During this meeting, Jones informed TFO Francis of a narcotics investigation he was conducting in which ORTALI was involved. Specifically, Jones informed TFO Francis he had reviewed the results of a cellular phone examination of the subject of his narcotics investigation, S.M., hereby referred to as the ("S.M. 3352 phone") and identified a series of text exchanges between the S.M. 3352 phone and the ORTALI 9430 phone.

28.   The cell phone examination of the S.M. 3352 phone covered the period of October 3, 2021 through December 14, 2021, resulting in approximately 215 text messages between the S.M. 3352 Phone and ORTALI.  Jones summarized that the contents of the messages mostly included discussions related to large scale narcotics sales.

29.   Below are excerpts from a text message conversation between the ORTALI 9430 phone and the S.M. 3352 phone on October 25, 2021:

- S.M.: "Come on bro I couldn't get anything, I've got enough to buy a piece"

- S.M.: "Ok I;m just going to come over, I'm parked around the corner"

- S.M.: "Hey I'm on your door step.  I had to walk in the rain, because I ran out of gas"

- S.M.: "I've got money and need fet"

30.   Based on my training, experience, and the facts of the investigation thus far, I know the term "fet" is slang for

fentanyl.  It appears that in this text message conversation, ORTALI is involved in the sale of fentanyl.

31.  Below are excerpts from a text message conversation between the ORTALI 9430 phone and the S.M. 3352 phone on December 14, 2021:

- S.M.: "How much are you going to charge me for a half of pound"
- ORTALI: "Of crap?"
- S.M.: "Fetty"

32.  Based on my training, experience, and the facts of the investigation thus far, I know the term "crap" is slang for methamphetamine and the term "fetty" is often associated with fentanyl.  It appears that in this text message conversation, ORTALI is involved in at least half-pound quantity sales fentanyl.

33.  On December 27, 2021, San Luis Obispo Sheriff's Deputy and TFO Francis conducted surveillance on the SUBJECT PREMISES. During the surveillance, TFO Francis observed ORTALI arrive and park at the residence driving a vehicle no longer owned by ORTALI.  ORTALI exited the vehicle and retrieved a small paper bag from the trunk and entered the garage.

34.  I know, from my conversations with other law enforcement officers, that the SUBJECT PREMISES is ORTALI's residence from numerous prior contacts with the San Luis Obispo Police Department; ORTALI listed this address in the San Luis Obispo Police Department records system; and ORTALI provided

this address as his place of residence with San Luis Obispo County Department of Probation.

35.   On December 27, 2021, law enforcement surveilled the SUBJECT PREMISES and saw ORTALI driving a vehicle registered to him and park it at his premises.

36.   On December 28, 2021, TFO Francis conducted surveillance on the SUBJECT PREMISES.  TFO Francis observed ORTALI enter a vehicle (not the SUBJECT VEHICLE) and drive away from the premises.  Approximately twenty minutes later, TFO Francis observed ORTALI return driving the same vehicle.

**B.   Law enforcement installs a GPS vehicle tracker on ORTALI'S primary vehicle**

37.   On August 5, 2021, the Honorable Louise A. LaMothe, United States Magistrate Judge for Central District of California, signed a federal warrant authorizing the installation of a GPS vehicle tracking device on ORTALI's primary vehicle, a 2001 General Motors Company Sport Utility Vehicle, bearing California license plate number 6TKL441 and vehicle identification number 1GKEC13T11R185721.

**C.   Law enforcement seeks a second GPS vehicle tracker warrant for ORTALI'S new primary vehicle**

38.   On or about January 18, 2022, law enforcement sought a GPS vehicle tracking warrant authorizing the monitoring of ORTALI's new primary vehicle, a 2012 Chevrolet sedan, California license plate 8YQS680, vehicle identification number 1G1ZD5E00CF2587 in case number 22-MJ-214.  The Court declined to issue the warrant.

13

D.   **The CHS identifies ORTALI being in possession of a large quantity of narcotics**

39.   On or about March 18, 2022, while working routine patrol for the San Luis Obispo County Sheriff's Office, Task Force Officer Justin Francis encountered the CHS.  During this encounter, the CHS advised he/she had recently spoken with ORTALI and ORTALI revealed to the CHS he was sitting on ten pounds of narcotics at his house, specifically concealed in his garage, at the SUBJECT PREMISES.

E.   **March 21, 2022: ORTALI sells the CHS 142 grams of methamphetamine**

40.   On March 21, 2022, at the direction of law enforcement, the CHS attempted to reach ORTALI via his cell phone, but the call was unanswered.  This call was recorded and placed in the presence of investigating agents.

41.   Several moments later, ORTALI returned the call to the CHS and the call was once again recorded.  Based on my review of the audio recordings and my conversations with the CHS, I know the following:

a.   ORTALI agreed to sell the CHS a "QP" (a quarter pound) of methamphetamine for $500.  ORTALI told the CHS to meet him at the Conserv Fuel gas station on Betteravia Street in Santa Maria, California.

b.   Approximately 15 minutes later, the CHS called ORTALI and asked him for an estimated arrival time.  ORTALI told the CHS he was currently at In & Out and to meet him there.

42.   Before sending the CHS to meet ORTALI at the In & Out, the CHS's person was searched by investigating agents and the

CHS was outfitted with multiple audio and video recording devices.

43.  Based on my review of the audio and video recordings and my conversations with the CHS, I know the following:

a.  At approximately 4:32 p.m., the CHS contacted ORTALI via cellphone and was told to meet him in the drive-through and that ORTALI was driving a maroon Mitsubishi Montero (i.e., the SUBEJCT VEHICLE).

b.  At approximately 4:33 p.m., the CHS entered the SUBJECT VEHICLE and was greeted by ORTALI.  The CHS directed ORTALI to a parking spot across the street and ORTALI drove there.  ORTALI asked the CHS, "Do you have a scale?"  The CHS replied "I do not."  Once parked, ORTALI retrieved a zip-loc style baggie from the center console of his vehicle and handed it to the CHS, stating, "It's over," meaning that ORTALI was providing more methamphetamine than he had agreed to.

44.  Minutes later, the CHS exited the SUBJECT VEHICLE. After exiting the SUBJECT VEHICLE, law enforcement met with the CHS at an undisclosed location.  During this time, law enforcement searched the CHS and collected the suspected drugs the CHS had received from ORTALI and the recording devices.

45.  On March 23, 2022, I conducted a search of a law enforcement database and learned the SUBJECT VEHICLE is a maroon 2001 Mitsubishi Montero SUV, with VIN JA4LS21H71P066281, and California License Plate number 5WUC906, and is registered to O.G., at an address on Saturn Court in Nipomo, California 93444

46.  On March 23, 2022, the suspected drugs ORTALI sold to the CHS were sent to the Drug Enforcement Administration ("DEA"), Southwest Laboratory, for analysis.

47.  On March 28, 2022, the DEA Southwest Laboratory returned the chemical analysis of the submitted narcotics purchased from ORTALI and identified the substance as methamphetamine hydrochloride with a purity of approximately 98% and net weight of approximately 141 grams.

48.  On or about March 24, 2022, I conducted a search of law enforcement databases for the SUBJECT PREMISES and learned that ORTALI is the listed resident of that address.

49.  On or about March 22, 2022, I contacted the San Luis Obispo Police Department and performed a database search for ORTALI and confirmed that, according to law enforcement records, ORTALI resides at the SUBJECT PREMISES.  Moreover, based on my review of the video recording of the transactions and review of ORTALI's DMV photograph, I believe the photograph of ORTALI matches the man who appears in the video recording of the March 21, 2022 drug sale.

50.  On March 28, 2022, TFO Francis conducted surveillance on the SUBJECT PREMISES.  TFO Francis observed the SUBJECT VEHICLE parked in the driveway of the SUBJECT PREMISES.

51.  At approximately 11:07 a.m., TFO Francis observed the SUBJECT VEHICLE exit the driveway of the SUBJECT PREMISES and drive away.  Due to the window tint on the SUBJECT VEHICLE, TFO Francis was unable to definitively identify the driver, however, according to TFO Francis, the driver resembled the appearance of

16

ORTALI.  Approximately three minutes later, TFO Francis observed the SUBJECT VHICLE return to the SUBJECT PREMISES.

52.  At approximately 12:07 p.m., TFO Francis observed a white Nissan Frontier truck exit the driveway of SUBJECT PREMISES.  The Nissan Frontier did not have a license plate attached to the front or rear of the vehicle and only displayed paper plates.  Approximately ten minutes later, TFO Francis observed the Nissan Frontier return to the SUBJECT PREMISES with the driver's window rolled down.  TFO Francis was able to positively identify ORTALI the driver of the Nissan Frontier as ORTALI.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

53.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools in their residences, stash houses, trusted and secure areas for drug transactions, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug trafficking business or to use those drugs personally.  It is common for individuals who live with drug traffickers or maintain the premises to be aware of the individuals' drug trafficking activity and the existence of drugs and paraphernalia at the location.

b.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

17

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c.   Drug traffickers, and those who maintain premises where drug trafficking occurs, often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

d.   Drug traffickers, and those who maintain premises where drug trafficking occurs, often keep firearms and ammunition in their residences or on their person in order to protect their drugs and drug proceeds.

e.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

18

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

    f.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences and vehicles. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

    g.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

    h.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

    i.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences or vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residences and vehicles, such as digital scales, packaging materials, and proceeds of drug trafficking.

    j.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

54.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Garret ORTALI's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ORTALI's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

57.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.   <u>CONCLUSION</u>

58.   For all of the reasons described above, there is probable cause to believe that Garret ORTALI has committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the residence, vehicle, and person described in Attachments A-1, A-2, and A-3.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1st day of
April, 2022.


_____
THE HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE